NEW YORK COUNTY.—HON. D. G. ROLLINS, SURROGATE.—April, 1886.

MATTER OF HOUSMAN.

*In the matter of the estate of* SARAH HOUSMAN, *deceased.*

Decedent's will gave the residue of her real and personal estate, including a dwelling house, to the executors, in trust to pay the net income to designated beneficiaries for life, and distribute the principal upon the death of the latter. The executors having, of their own motion, taken out policies of insurance of the house mentioned, which, in fact,

enured to the protection both of the equitable life tenants and of the remaindermen,—

*Held*, that the charge for the premiums should be apportioned between the two classes of beneficiaries, according to the values of their respective interests, as determined by the Northampton tables.

Peck v. Sherwood, 56 *N. Y.*, 615—followed.

Where a will limits a gift of general residue in successive estates, the first taker, unless an intent appears that he should enjoy the subject *in specie,* is not entitled to the annual proceeds of such property as may be held by the executors ; but the property is to be treated as if converted and capitalized, so as to allow such taker the annual income that would be yielded by such capital, and to preserve the latter to meet subsequent claims under the settlement.

The will, which directed a conversion of the entire property, provided that, until this was effected, the executors should "receive the rents, interest and income thereof," and pay and apply them, as required with respect to interest and income of proceeds of sale. The executors retained, for several years, household furniture belonging to the estate, and let the same with the house in which it was contained, this course being obviously for the advantage of the life beneficiaries.—*Held*,

1. That the executors were justified in retaining annually a portion of the income, to meet a prospective loss, by depreciation, upon the sale of the furniture.

2. That, upon such sale, a sum equal to the depreciation should be transferred from income to capital account, provided that the life beneficiaries would thus receive as much income as if the furniture had been promptly converted, and the house let vacant.

HEARING of exceptions to report of referee to whom were referred the account of the executors of decedent's will, and objections thereto, filed in proceedings for judicial settlement.

JOHN T. LOCKMAN, *and* CHARLES JONES, *for executors.*

ROGER FOSTER, *special guardian for infant objectors.*

THE SURROGATE.—This testatrix, by the seventh article of her will, devised and bequeathed to her executors the rest, residue and remainder of her estate, real and personal, upon the trust following : " To sell and dispose of all my real estate at public auction, or

by private contract, at such time or times and in such manner and upon such terms as my said executors shall think proper, and to convert all my personal estate into money, and divide the net proceeds of said real and personal estate into seven equal shares." Direction is then given by the will for the distribution of the net income and interest arising from these several investments among certain specified beneficiaries for life, and for the distribution in each case of the principal funds, as those life interests shall respectively terminate.

The eighth clause of the will directs that, until the sale and disposition of the real and personal estate, the executors shall "receive the rents, interest and income thereof," and shall "pay and apply the same in the manner and proportions above directed with respect to the interest and income of the proceeds thereof."

The testatrix died in 1877. In November, 1878, the executors presented their first account, which was judicially settled by a decree entered on March 22nd, 1879. Their second account was filed in July last, and objections having been interposed, the issues were submitted to a referee, whose report is now before me on a motion for its confirmation. Two exceptions are urged by the accounting parties to the referee's findings. They are as follows:

*First.* The executors expended the sum of $156.50 for seven years' fire insurance on premises belonging to the estate at No. 46 west twenty-fifth street. This item appears in the account as a charge against income exclusively. The referee declares it as his opin-

ion that, if the insurance premiums had been paid out of the principal estate as the policies were from time to time renewed, the sum thus expended would have fairly apportioned itself between the remaindermen and the life tenants, the prospective income of the latter being in this way equitably reduced from year to year by a reduction of the sum from which such income was derivable. The referee holds, accordingly, that this item of $156.59 has no place in the income account, but should be charged wholly to principal.

I have made a careful search for judicial decisions upon the question of the propriety of apportioning the cost of fire insurance as between life tenant and remainderman, or as between the two beneficiaries of a trust fund, one of whom is entitled to the income for life, and the other to the principal at the termination of the life interest. There are very few reported cases in which this question has been considered, but it seems to me to have been squarely determined in Peck v. Sherwood (56 *N. Y.*, 615). The Court of Appeals there decided that, where one who held, under a testator's will, a life tenancy in certain premises had expended moneys for insurance thereon, he was entitled to contribution from the executor of the estate—such executor being a person who upon the life tenant's death would take such premises, as devisee in trust of the remainder.

It is claimed by the exceptors herein that the case at bar is distinguishable from that just cited in this respect; that here neither the beneficiaries of the income nor those of the principal have any insurable

interest as such in the property insured, while in Peck v. Sherwood both the life tenant and the remainderman had separate legal estates upon which each might have obtained separate insurance.

I am by no means clear that the distinction thus suggested is a true one. In his treatise on Trusts (3rd ed., § 553), Mr. Perry says: "Both the equitable tenant for life and the remainderman have an insurable interest in the trust estate; and if one insures his own interest in the buildings and they are burned, neither can call upon the other for any part of the insurance money."

But assuming that, in the case at bar, the *cestuis que trustent* for life and those in remainder are, each and all, without insurable interest in the property, it seems to me that the doctrine of Peck v. Sherwood is for that very reason applicable with all the greater force. For in that case the remainderman might well have said to the life tenant: "You have of your own accord, and not at my request or with my sanction, seen fit to expend moneys for the insurance of my property, and that too when your own interests therein could, without resort to such a course, have been effectually protected. I owe you nothing." On the other hand, if these accounting executors can justly claim to be reimbursed for the sums expended by them in insuring their interest as trustees in the twenty-fifth street property, it must be upon the theory that the procurement of such insurance was necessary or desirable for the protection of the interests of all the *cestuis que trustent*. It might have been possible for the executors to have thus pro-

tected the interests of the equitable life tenants only, or of the equitable remaindermen only.   They seem to have thought proper to protect all; and it is but just, therefore, that the necessary expense of that protection should be met by all, in the ratio of their respective interests.

I again quote Perry on Trusts (§ 553):  " The trustee has an insurable interest in the buildings upon the trust estate, and if he insures and the buildings are entirely destroyed by fire . . . . . the tenant for life and the remainderman will receive their respective rights and interests " (*i. e.*, in the proceeds of insurance) " according to the terms of the settlement."

Judge FOLGER did not, in Peck v. Sherwood, lay down any definite scheme of apportionment.   He simply declared that the remainderman should contribute " a proper portion of the sum paid for premiums."   I am informed by Surrogate COFFIN that the course actually pursued in that case was to ascertain the life tenant's interest in the insured property according to the Northampton tables, and taking the difference between that sum and the total value of the property as the interest of the remainderman, to make the apportionment upon that basis.   That mode of calculation may be adopted here.

*Second.* The other exception of the executors relates to the refusal of the referee to sanction the transference from income to capital of a sum equal to the amount of depreciation in the value of certain furniture held by them as part of the residuary trust estate.   This furniture was in use by Mrs. Housman at the time of her death at her residence, No. 46 west

twenty-fifth street, in this city.   The executors still retain those premises, having never been able, as they state in their account, to sell the same for what they have deemed a fair price.   At the time of their first accounting in November, 1878, they reported to the Surrogate that in their judgment. it had theretofore been and still was for the best interests of the estate to rent that property furnished, rather than to rent it unfurnished, and to sell the furniture.   The special guardian of a lunatic party in interest insisted that such sale ought to be at once effected.   The views of the executors in this matter were sustained by an auditor to whom the accounts were submitted by the Surrogate.   A decree was entered on March 22nd, 1879, upon the coming in of the auditor's report, which contains this provision:   "And it appearing from schedule B, No. 1 of the account, . . . . . that an immediate distribution of certain of the personal property mentioned in such schedule is not at the present time desirable, it is ordered that the executors retain" (among other things) "the following assets: Household furniture inventoried, $1,991.50."

I think that the evidence supports the claim, made by the executors in schedule B, of the account here in controversy, that they have obtained, by letting the furniture with the house, $2,500 more rent than they could have obtained by letting the house unfurnished. Meantime, the furniture has, of course, been greatly depreciating in value, and, according to the testimony of Mr. De Waltearrs, is worth to-day only about one half what it was worth at the time of the appraisement on the former accounting.   The evidence

satisfies me, however, that if it should be sold at
its present appraised value, and if, out of income
that the executors have from time to time retained
to cover its depreciation, the amount of that depre-
ciation were to be turned over to the *corpus* of the
estate, the *cestuis que trustent* for life would be found
to have received larger revenues than they would
have obtained from the rents of the house unfur-
nished, together with the income that could have
been derived from the proceeds of the furniture
itself. · The referee has held that, as the beneficia-
ries under the will were all parties to the former ac-
counting proceeding, they are bound by the decree
that the furniture should be retained as part of the
residuary estate ; that, under the seventh and eighth
clauses of the will, the life tenants are entitled ·to the
total income of the residue, and that, therefore, the
depreciation of $996.25 ought not to be charged in
whole or in part against such life tenants.    To this
finding the executors except.

Unless there is some strict rule of law which neces-
sitates the conclusion of the referee, or unless the re-
maindermen are estopped by the decree of March
22nd, 1879, from claiming credit on account of this
depreciation, it seems but just that the depreciation
should be made good out of the enhanced rental aris-
ing from the use of the furniture ; otherwise the
beneficiaries for life get all the advantage of the
course pursued by the executors, and those in re-
mainder suffer all the loss.

I do not agree with the referee in the opinion that
the matter has already been adjudicated by the de-

cree on the former accounting. The decree did not, it is true, direct that the income account should be charged with the depreciation of furniture ; but, on the other hand, it did not direct that the loss by that depreciation should fall upon capital. It gave no direction in the premises whatever. Its sole effect was to absolve the executors from personal liability in case the retention of the furniture and the renting it with the house should prove to be an unprofitable venture.

If the executors had never, until now, presented an account for settlement, and if the parties hereto had not been parties to the proceeding which terminated in the decree of 1879, I can conceive of no situation which would more clearly call for the application of the doctrine respecting the apportionment of the interests of life tenants and remaindermen, which is referred to in the decision of the Surrogate of this county in the Matter of Kendall (*ante*, 133). The doctrine is this : That where a testator has limited a gift of general residue in successive estates, the first taker is not to have the annual proceeds of such property as may be held by the executors *in specie*, but such property must be treated as if converted and capitalized, so as to allow the first taker the annual income that would be yielded by such capital, and to preserve the capital itself to meet subsequent claims under the settlement. The rule is subject to this exception, that where from the whole will it appears that the testator intended that the first taker should enjoy the subject of the gift *in specie*, he should be permitted to do so, even though that course might

ultimately deprive the person entitled in remainder of any advantage whatsoever.

The doctrine is thus stated in the recent case of Macdonald v. Irvine (*L. R.*, 8 *Ch. Div.*, 112): " Where there is a residuary bequest of personal estate to be enjoyed by several persons in succession, a court of equity, in the absence of a contrary intention, will assume that it was the intention of the testator that the legatees should enjoy *the same thing* in succession, and, as the only means of giving effect to such intention, will direct the conversion, into permanent investments of a recognized character, of all such parts of the estate as are of a wasting or reversionary character, and also of all such other existing investments as are not of the recognized character, and are consequently deemed to be more or less hazardous."

In such cases, therefore, if property which ought to be converted is held by executors, a tenant for life is not entitled to the annual produce, but to interest at some fixed rate upon the estimated value of the unconverted property or upon the value as it may be subsequently ascertained.

The principle thus enunciated has never, so far as I have discovered, been disapproved by the courts of this State, and is expressly sanctioned by Covenhoven v. Shuler (2 *Paige*, 122); Cairns v. Chaubert (9 *id.*, 160); Spear v. Tinkham (2 *Barb. Ch.*, 211); Lawrence v. Embree (3 *Bradf.*, 364).

Now, I repeat that the only effect of the decree of 1879 was to exonerate these executors from liability for their failure, up to the date of their first accounting, to sell the furniture in question, and for their re-

tention of such furniture for some unspecified period in the future. But that the decree has had the effect of practically transforming the decedent's general disposition of the residue into a specific bequest to the life beneficiaries of the use of the furniture I cannot believe. I am bound, it seems to me, upon a fair construction of that decree, and of the will itself, to apply the doctrine above referred to as nearly as may be, and accordingly to hold that whenever the furniture shall be sold, a sum equal to the depreciation in its value *since November 14th,* 1878 (the day to which the former accounting was brought down), shall be transferred from income to capital, *provided,* that, by the adoption of such a course, the persons entitled to the income will still receive as large an amount as would have been obtained by them if the furniture had been promptly converted and the house rented without it.

If, on the other hand, the loss by depreciation in the value of the furniture, as ascertained upon its sale, shall prove to be greater than the enhancement of income by the retention of such furniture, the precise course that I have suggested will not be equitable, but in its place some scheme of apportionment will need to be substituted. As regards this question, therefore, the decree to be entered upon this accounting will simply contain a provision for the continued retention of the portion of the income already withheld, and for the retention, besides, of such reasonable sum out of future income as will suffice to make good the probable loss by depreciation in the value of the furniture.

Delay in making the conversion directed by the will should not inure to the advantage of the beneficiaries for life as against the remaindermen, or to the advantage of the latter as against the former, but to the advantage of the estate as a whole, and the equities should be adjusted between the successive takers (Beavan v. Beavan, *L. R.*, 24 *Ch. D.*, 649, n.; People *ex rel.* Cornell University v. Davenport, 30 *Hun*, 177).

It was not the intention of the testatrix that such delay should result, as between the successive takers, in the enjoyment by any beneficiary of an advantage whereof a prompter conversion would have deprived him.

Let a decree be entered in accordance with this decision. It must not sanction the retention of any portion of the income to cover such depreciation as may have occurred between the death of the testatrix and November 14th, 1878. All the income received up to that time from the rent of the twenty-fifth street house seems to have been distributed, and the propriety of that distribution was adjudicated by the decree of 1879. That decree cannot now be disturbed.